IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JONATHAN F. RAMOS,<br><br>        Plaintiff,<br><br>vs.<br><br>VALMONT INDUSTRIES, INC.,<br>ANGIE WRIGHT, TIM KENNEDY, and<br>KEVIN STRUDTHOFF,<br><br>        Defendants. | 8:18CV313<br><br>MEMORANDUM<br>AND ORDER |

This matter is before the court upon review of Plaintiff's Amended Complaint (filing 12) to determine whether summary dismissal is appropriate under 28 U.S.C. § 1915(e).

## I. BACKGROUND

Plaintiff filed this action on July 3, 2018, and was given leave to proceed in forma pauperis. (Filing 1; Filing 5.) In his Complaint, Plaintiff raised three claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 to 12117, against Valmont Industries, Inc. ("Valmont") and John W. Smith, legal counsel for Valmont, alleging Valmont wrongfully discharged him on account of his hearing disability, failed to provide him a reasonable accommodation, and retaliated against him. The court conducted an initial review of Plaintiff's Complaint on November 8, 2018. (Filing 11.) The court dismissed Plaintiff's claims against Smith due to the lack of an employee-employer relationship and determined that the Complaint's allegations failed to state a plausible claim for relief against Valmont under any of the three alleged theories. The court granted Plaintiff leave to amend his Complaint, and Plaintiff filed his Amended Complaint on December 6, 2018. (Filing 12.)

Plaintiff's Amended Complaint consists of the form Pro Se 7 Complaint for Employment Discrimination and 80 pages of attached exhibits and Plaintiff's 7-page typed "Summary of complaint." (*See id.* at CM/ECF pp. 9–10, 14–15, 53–54, 74.) Plaintiff also subsequently filed another 50 pages of supplements and exhibits (filings 15–19, 24, & 26), which he did not seek permission to file. *See* Fed. R. Civ. P. 15(a) (party may amend its pleading once as a matter of course within 21 days[1] after serving it or after service of responsive pleading or Rule 12 motion; otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave"); NEGenR 1.3(g) ("Unless stated otherwise, parties who proceed pro se are bound by and must comply with all local and federal procedural rules."). Therefore, the court shall perform its review of Plaintiff's Amended Complaint (filing 12) only.

## II. APPLICABLE STANDARDS ON INITIAL REVIEW

The court is required to review in forma pauperis complaints to determine whether summary dismissal is appropriate. The court must dismiss a complaint or any portion of it that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B). Pro se plaintiffs must set forth enough factual allegations to "nudge[ ] their claims across the line from conceivable to plausible," or "their complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569–70 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party

---

[1] Plaintiff filed seven letters with attached exhibits (filings 15–19, 24, & 26) beginning in March 2019 and continuing through December 2020—well beyond 21 days after December 6, 2018, the filing date of his Amended Complaint.

'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). "A pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties." *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted). A "liberal construction" means that if the essence of an allegation is "discernible, the district court should construe the plaintiff's complaint in a way that permits his or her claim to be considered within the proper legal framework." *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015). However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980).

## III. SUMMARY OF AMENDED COMPLAINT

Plaintiff's Amended Complaint again asserts an ADA discrimination claim[2] arising out of his employment at Valmont Newmark in Columbus, Nebraska ("Valmont Newmark") against Valmont, as well as three additional defendants: Tim Kennedy ("Kennedy"), Valmont's Vice President Human Resources Utility; Angie Wright ("Wright"), Valmont Newmark's Human Resources Manager; and Kevin Strudthoff ("Strudthoff"), Valmont Newmark's General Manager (collectively "Defendants"). Plaintiff alleges Defendants terminated his employment, failed to promote him, failed to accommodate his disability, subjected him to unequal terms and conditions of his employment, and retaliated[3] against him because he is deaf. (Filing 12 at CM/ECF p. 4.) As Plaintiff's

---

[2] Plaintiff also purports to assert state-law discrimination claims pursuant to Neb. Rev. Stat. §§ 20-150, 20-156, and 71-4728. (Filing 12 at CM/ECF p. 3.) However, these statutes merely set forth the Nebraska Legislature's policy to provide interpreters to the deaf and hard of hearing in public proceedings and education and outline the purpose and duties of the Commission for the Deaf and Hard of Hearing. None of these statutory sections provides a private right-of-action for discrimination.

[3] Plaintiff specifically alleges retaliation by Kennedy and Wright. (Filing 12 at CM/ECF p. 9.)

Amended Complaint is over 80 pages in length, including the attachments, the court feels a detailed recitation of Plaintiff's factual allegations will be helpful in addressing his legal claims.

Plaintiff alleges he began employment with Valmont as a welder in February 2014 at the Brenham, Texas facility. (Filing 12 at CM/ECF p. 9.) Plaintiff was provided an American Sign Language ("ASL") interpreter and English closed-captioning subtitles during his orientation, and the interpreter "explained the position and then confirmed it" prior to Plaintiff signing the Employee Acknowledgement Form, acknowledging receipt of the employee handbook and his "responsibility to read and follow the policies contained" therein. (*Id*. at CM/ECF pp. 9, 12.)

Due to a downsizing of the Brenham, Texas facility, Plaintiff applied and interviewed for a position with Valmont Newmark in Columbus, Nebraska. (*Id*. at CM/ECF pp. 9–10, 83.) On May 11, 2015, Plaintiff participated in a phone conference through a video relay service ("VRS") interpreter with Wright, Manager Michael Lackey ("Lackey"), and Supervisor Brian Scheel ("Scheel"). Plaintiff discussed his disability and requested an ASL interpreter in safety training and to accompany Plaintiff inside the Columbus facility for Orientation Day because an interpreter "would enable [him] to ask more questions and/or to 'hear' the questions brought up by others in safety training . . . and would ensure effective communication after transferring." (*Id*. at CM/ECF p. 10.) Wright, Lackey, and Scheel responded, "We will look to find an interpreter." (*Id*.) Plaintiff traveled to Columbus, Nebraska on May 14, 2015, and met with Human Resources Generalist Jenny Beaver and Scheel to tour the Columbus facility and "to explain everything and training." (*Id*.) Before returning to Brenham, Texas on May 15, 2015, Plaintiff requested an ASL interpreter be provided upon his transfer from Texas to Nebraska. (*Id*. at CM/ECF pp. 10, 16–17.)

On May 20, 2015, Plaintiff received an offer to transfer to the "Welder I – Evening Shift" position at Valmont Newmark, which he signed and accepted. (*Id*.

at CM/ECF pp. 10, 18–19.) When Plaintiff arrived at Valmont Newmark for Orientation Day on June 8, 2015, he was not provided an ASL interpreter or subtitled English while Strudthoff and Safety Manager "Jessica" went over training materials and led the employees on a tour of the facility. (*Id*. at CM/ECF p. 10.) On June 9, 2015, Plaintiff was given the Employee Acknowledgement Form to sign, acknowledging receipt of the handbook and his responsibility to read and follow the handbook policies. (*Id*. at CM/ECF pp. 10, 14, 21.) Plaintiff initially wrote a note saying, "Not without an interpreter provide before I sign it." (*Id*. at CM/ECF pp. 10, 20.) Wright told Plaintiff, "We will not let you continue [as] an employee [at] Valmont Newmark Columbus facility unless you sign the form." (*Id*. at CM/ECF pp. 10, 14.) When Plaintiff expressed his unhappiness with the lack of an interpreter, Wright said that they were "confirming interpretation to look and find it," but Plaintiff "had no choice but to sign without an interpreter." (*Id*. at CM/ECF p. 14.)

Plaintiff alleges he made numerous requests for an interpreter between June and November 2015 but was not provided with an interpreter until November 16, 2015. (*Id*. at CM/ECF p. 14.) On that date, Plaintiff, Wright, and Scheel met with Peggy Williams and a staff interpreter from the Nebraska Commission for the Deaf and Hard of Hearing, and Ms. Williams explained "why the writing of notes might not be effective for [Plaintiff] when the complexity of the communication for things like safety training is involved." (*Id*.) Subsequently, Plaintiff was provided an ASL interpreter during monthly safety meetings starting December 3, 2015, but Wright continued to refuse to allow Plaintiff to bring an interpreter with him inside the facility or to review the employee handbook with an interpreter. (*Id*. at CM/ECF p. 15.)

On March 22, 2016, Plaintiff alleges he was given permission by his lead man Cody Snow ("Snow") to go to the break room and buy a drink or snack while they waited for repairs to be made to certain equipment. However, Plaintiff later received a Corrective Action Form consisting of a "1st Step (Warning)" for "Loafing" which stated,

> On 3/22/2016 Jonathan Ramos was viewed repeatedly going in and out of the breakroom to buy and warm food during work hours between 3:30 p.m. and 4:30 p.m. Employees are expected to remain busy and in their assigned work areas between breaks. Shift starts at 3 p.m. and first break is at 5 p.m. Time away from work to eat needs to occur during the normal break schedule.

(*Id*. at CM/ECF p. 60.) Plaintiff initially refused to sign the write-up and alleges he was not given a chance to explain that he kept busy and missed his lunch since he got a break when the machine was broken. In response to Plaintiff's concerns about the corrective action form, Kennedy investigated the matter and, in an email dated April 12, 2016, informed Plaintiff:

> Yesterday after learning of your conversation with Mr. Andy Massey, I spoke with Angie Wright, HR Mgr. for Columbus. She shared with me that you were not receiving Corrective Action for eating on the shop floor (no such policy exists for that site) but rather for taking a break period before the scheduled break period. She discovered this violation after reviewing security camera video while trying to investigate an unrelated incident at the plant. She said there is video footage that you went in and out of the break room several times before the scheduled break period. As a result of this violation, you were being issued first step corrective action which is part of our standard multi-step progressive disciplinary program. I can assure you others at that location have received similar corrective action notices for the same violation.

(*Id*. at CM/ECF p. 58.) Kennedy also encouraged Plaintiff to discuss any concerns or misunderstandings about the corrective action with Wright at his annual performance review the following day when an interpreter would be provided. (*Id*.)

On April 13, 2016, Plaintiff met with Wright and Lackey and was provided an interpreter. Plaintiff alleges he was confused about the policy since Snow told him he had permission to go to the breakroom. "Angie [Wright] said she watched the camera in breakroom [and] Michael Lackey manager was laughing and said 'I

6

work here Valmont for longer time than you and I know the employees abuse the policy like you. And now sign [the Corrective Action Form].'" (*Id.* at CM/ECF pp. 53, 60.) Plaintiff signed the form. (*Id.* at CM/ECF p. 60.) Plaintiff also asked Wright about reviewing the handbook face-to-face with an interpreter, and Wright "did not respond" but remarked that Plaintiff had already signed the handbook and Employee Acknowledgement Form. (*Id.* at CM/ECF p. 53.) Plaintiff alleges he "felt betrayed when Angie [Wright] said she was finding an interpreter but not do it." (*Id.*)

On July 21, 2016, Plaintiff applied for a shift supervisor position and alleges "Kevin [Strudthoff], Angie [Wright], and Lonnie [Smith] were aware [Plaintiff] applied before [he] discussed with them about the job requirements saying [Plaintiff] couldn't apply even with a correction action form, etc. They said go ahead try it." (*Id.* at CM/ECF pp. 54, 63–64.) Plaintiff was not awarded the supervisor position. (*See Id.* at CM/ECF pp. 4, 84.)

On July 22, 2016, Plaintiff was involved in an incident with his supervisor Lonnie Smith ("Lonnie"), another lead man "Spencer," and another employee "Chad." As best the court can ascertain, Plaintiff alleges that Chad had been harassing him for two weeks, that Plaintiff reported this harassment to Spencer and Lonnie, but that no action was taken. Plaintiff asserts that on July 22, 2016, Lonnie "forced [Plaintiff] off the hose and grinding air then gave to Chad with smile friendly after Chad mocked [Plaintiff]" even though Spencer had given Plaintiff the "large hose" to complete his job and Plaintiff was almost done. (*Id.* at CM/ECF pp. 54.) Plaintiff emailed supervisor Jason W. Avery, Wright, and Lackey about this incident and expressed that he believed this treatment was inequitable as Plaintiff had to give up his equipment for the other employee when, in a similar situation, Plaintiff had to go look for another piece of equipment instead of taking equipment from another worker. (*Id.* at CM/ECF p. 67.) Plaintiff also spoke with Wright and Lackey in the office, explained that he was upset, and they told him they would investigate the matter. (*Id.* at CM/ECF p. 54.)

7

On July 26, 2016, Plaintiff met with Wright and Lackey with an interpreter present and was issued a Corrective Action Form consisting of a "Final Notice and/or Suspension" for "Insubordination." (*Id*. at CM/ECF p. 68.) The form stated:

> Jonathan has engaged in recent acts of insubordination, including refusing to follow instructions from his supervisors. His conduct is unacceptable and he has been advised of this in a meeting held on July 26, 2016. The recent incidents are as follows:
>
> On 7/22/2016 Jonathan was instructed by his supervisor (Lonnie Smith) to switch hoses with the welder in the next station because this welder needed a longer hose to perform his work and Jonathan did not require the longer hose. Jonathan refused to switch hoses and provided no explanation for his refusal. When Lonnie attempted to switch the hoses Jonathan attempted to prevent this by turning the air on while it was being disconnected. It was clear that Jonathan did not need the longer hose and could have used the shorter hose to finish his task.
>
> By signing this Jonathan indicates understanding that he needs to follow the directions of the supervisors and leads and work with his co-workers in a team environment.

(*Id*. at CM/ECF p. 68.)

Plaintiff also appears to allege that on or about July 26, 2016, Defendants were planning to move him back to second shift even though he had transferred to third shift in May 2016 and had enjoyed "a good environment, employees, and supervisor." (*Id*. at CM/ECF pp. 53–54.) Plaintiff alleges he spoke with an employee, Jorge, on July 27, 2016, "about 2 shift different than 3 shift and [said,] 'I'm think about files complaint at EE[OC].'" (*Id*. at CM/ECF pp. 54, 71–72.)

On July 29, 2016, Wright emailed Plaintiff stating, "Now that we have an interpreter that you feel more comfortable with we should be able to start this process [of reviewing the handbook as you requested]. . . . I hope that we can start next week after the safety meeting." (*Id*. at CM/ECF pp. 65–66.) In response,

Plaintiff stated the reason why he requested to review the handbook was due to the recent accusations against him. (*Id*. at CM/ECF p. 66.) Wright responded that they should "discuss this and any other questions [Plaintiff] might have following the safety meeting when the interpreter will be present." (*Id*.) The attachments included with Plaintiff's Amended Complaint indicate that an interpreter was provided to go over the handbook with Plaintiff as he requested. (*Id*. at CM/ECF p. 84.)

On August 18, 2016, Plaintiff received an email from Wright stating that lead man Martin Gomez reported Plaintiff failed to use proper safety equipment and asking Plaintiff if he could meet with Wright, Strudthoff, and Lackey to discuss the reported violation with an interpreter present. (*Id*. at CM/ECF pp. 74, 77–78.) Wright declined to discuss the report with Plaintiff over email or the phone in favor of a face-to-face meeting with the interpreter present "to ensure that you [Plaintiff] have opportunity to explain and that is easier for all in person." (*Id*.) With an interpreter present, Plaintiff met with Wright, Strudthoff, and Lackey on August 22, 2016, and Strudthoff told Plaintiff he was "suspended for 3 days for failure [to] wear safety protection for face equipment while grinding" so that Valmont could investigate to determine whether Plaintiff violated safety policies. (*Id*. at CM/ECF p. 74.) Plaintiff told them that the same employee who had been bothering Plaintiff, Chad Heffner, was falsely accusing him and another employee, Jorge, and Chad was the same person who accused Plaintiff in the July 22, 2016 incident. Plaintiff also explained his conduct in the reported safety violation: "I would moment[ari]ly take the shield off to look at my work clearly when not grinding, and flip it back on when I started to actually grind again." (*Id*.)

On August 25, 2016, while he was suspended, Strudthoff called Plaintiff on his VRS through an interpreter and told Plaintiff he was terminated and not to return to Valmont Newmark. Plaintiff received a termination letter dated August 25, 2016, which stated, in part:

9

> On [August 17, 2016], it was reported by your lead man that you violated safety procedures by failing to wear appropriate eye and face protection equipment while grinding. We confirmed through our investigation that your conduct was witnessed by other employees. This failure to follow procedure presents a major safety hazard, as we have discussed with all employees on many occasions during safety meetings.
>
> During our meeting with you yesterday as part of our investigation, you did not provide an adequate explanation for violating the rule. At the same time, you clearly acknowledged your understanding of the importance of the safety rule. You also acknowledged your understanding that you could at any point stop working if it would otherwise require you to violate a safety rule. Yet you continued to perform grinding even after being warned. As a result of our investigation, we have concluded that you violated the rule without justification.

(*Id*. at CM/ECF p. 79.) The termination letter also noted Plaintiff's previous corrective actions and that the discussions regarding Plaintiff being placed on final notice and of the importance of following the rules were conducted with the assistance of a certified translator with Plaintiff's consent. (*Id*.)

As relief, Plaintiff seeks to be re-hired or, in the alternative, $10,000 in damages.

### IV. DISCUSSION

Liberally construed, Plaintiff seems to be bringing three claims under the ADA—discrimination, failure to accommodate, and retaliation. As set forth in the ADA:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

> compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (Westlaw 2021).

### A. Proper Defendants

As an initial matter, Plaintiff has named several individual Valmont employees as Defendants in this matter. However, as the court has previously explained, the ADA imposes liability on *employers*. 42 U.S.C. § 12111(5)(A). The Amended Complaint's allegations clearly indicate that Defendants Kennedy, Wright, and Strudthoff are employees of Valmont and cannot be considered "employers" of Plaintiff. Thus, Plaintiff's ADA claims against these Defendants may not proceed and will be dismissed. *See Loeckle v. State Farm Auto. Ins. Co.*, 59 F. Supp. 2d 838, 846 (N.D. Iowa 1999) (dismissing one of named defendants for lack of employee-employer relationship), *aff'd*, 210 F.3d 379 (8th Cir. 2000); *Ramos v. Valmont Indus., Inc.*, No. 8:18CV313, 2018 WL 5840764, at *2 (D. Neb. Nov. 8, 2018) (attorney for employer could not be considered "employer" of plaintiff for purposes of ADA).

### B. Discrimination

To establish a claim of discrimination under the ADA, a plaintiff must demonstrate "(1) that [he] was disabled within the meaning of the ADA; (2) that [he] was qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) a causal connection between an adverse employment action and the disability." *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021) (internal quotation marks and citation omitted). A person is disabled within the meaning of the ADA only if he demonstrates that he has a physical or mental impairment which substantially limits one or more of his major life activities, that he has a record of such an impairment, or that he is regarded as having such an impairment. *Amir v. St. Louis University*, 184 F.3d

11

1017, 1027 (8th Cir. 1999). "Major life activities under the ADA are basic activities that the average person can perform with little or no difficulty, including 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 861 (8th Cir. 2006) (quoting 29 C.F.R. § 1630.2(i)).

Liberally construed, Plaintiff alleges that he has a hearing disability requiring him to communicate through American Sign Language, that he was not promoted to the shift supervisor position, that Valmont disciplined him, that he was harassed, and that he was terminated. Plaintiff has alleged sufficient facts to establish that he was disabled within the meaning of the ADA, that he is a "qualified individual," and that he suffered an adverse employment action. However, Plaintiff has not alleged sufficient facts from which the court can reasonably infer a causal connection between any of the adverse employment actions he suffered and his disability. Plaintiff has alleged no facts suggesting that the denial of the promotion, the discipline he received, or his termination were caused by his disability.

Plaintiff also alleges that he was "harassed" by another Valmont employee, Chad, for at least two weeks in July 2016 and that the employee continued to "bother" him up to the date of his suspension in August 2016. (Filing 12 at CM/ECF pp. 54, 74.) The Eighth Circuit has held that hostile work environment claims are actionable under the ADA. *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003). To prevail on a hostile work environment claim under the ADA, Plaintiff must show "that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment." *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 778 (8th Cir. 2012) (internal quotation marks and citation omitted). "When the alleged harasser is the plaintiff's fellow employee there is a fifth element: that the employer knew or should have known of the harassment and failed to take proper action." *Id.* (citing *Palesch v.*

*Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000)). This element does not apply to allegations of supervisory harassment. *Id*. Here, Plaintiff alleges that he reported the harassment to his supervisors. (*See* Filing 12 at CM/ECF pp. 54, 67.)

Plaintiff's allegations fail to show that the harassment was severe enough to affect the terms, conditions, or privileges of his employment. The Eighth Circuit has "repeatedly emphasized that anti-discrimination laws do not create a general civility code." *Id*. (quoting *Shaver*, 350 F.3d at 721). "A hostile work environment must be both subjectively and objectively offensive, as well as 'extreme in nature and not merely rude or unpleasant.'" *Id*. (quoting *Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 751 (8th Cir. 2009)). "In determining whether a plaintiff has demonstrated a hostile work environment, we consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's job performance." *Id*. (quoting *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010)). "The stringent hostile work environment standard is designed to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing." *Moses v. Dassault Falcon Jet-Wilmington Corp*, 894 F.3d 911, 922–23 (8th Cir. 2018) (internal quotation marks and citation omitted). "The plaintiff must show that the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment." *Id*. (internal quotation marks and citation omitted).

### C. Failure to Accommodate

Plaintiff next claims that Valmont failed to accommodate his disability by failing to provide an ASL interpreter for his initial training and for the period between June 2015 and November 2015. To state a failure-to-accommodate claim, a plaintiff first "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv.*,

*Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). "The plaintiff then has the burden to show 'that the requested accommodation is reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" *Orr v. City of Rogers*, 232 F. Supp. 3d 1052, 1061 (W.D. Ark. 2017) (quoting *Peebles v. Potter*, 354 F.3d 761, 768 (8th Cir. 2004) (internal quotation marks omitted)).

An employer is not obligated to provide an employee the accommodation he or she requests or prefers. *See, e.g., Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2000). *See also Lors v. Dean*, 595 F.3d 831, 835 (8th Cir. 2010) (defendants were not required to employ plaintiff in team leader position, even if he could maintain better control of his diabetes in that position). The employer need only provide some reasonable accommodation. *Hennenfent v. Mid Dakota Clinic, P.C.*, 164 F.3d 419, 422 n.2 (8th Cir. 1998); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir. 1999) (en banc) ("If more than one accommodation would allow the individual to perform the essential functions of the position, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.") (internal quotation marks and citation omitted).

As stated above, Plaintiff has not pleaded sufficient facts to establish a prima facie case of discrimination. Moreover, Plaintiff alleges that Valmont did provide him interpretation services from December 2015 through his termination in August 2016, and Plaintiff has failed to allege that those services were not reasonable. Based on these allegations, the court cannot reasonably infer that Valmont failed to accommodate his disability in violation of the ADA. Thus, Plaintiff's failure-to-accommodate claim will be dismissed.

## **D. Retaliation**

Liberally construed, Plaintiff claims that he was terminated because he requested an accommodation that Valmont deemed too costly. (Filing 12 at

CM/ECF pp. 74, 80.) The ADA prohibits retaliation, providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). "To establish unlawful retaliation under the ADA, a plaintiff must show that (1) []he engaged in a statutorily protected activity, (2) the employer took an adverse action against h[im], and (3) there was a causal connection between the adverse action and the protected activity." *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013) (citing *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999)). "Under the ADA, a retaliation claim 'requires a but-for causal connection between the employee's assertion of [his] ADA rights and an adverse action by the employer.'" *Moses v. Dassault Falcon Jet-Wilmington Corp*, 894 F.3d 911, 924 (8th Cir. 2018) (quoting *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 758 (8th Cir. 2016)).

Requesting an accommodation may be considered a protected activity under the ADA, *see Hill*, 737 F.3d at 1219. However, Plaintiff has failed to allege sufficient facts supporting a causal connection between his request for an accommodation and his termination. Plaintiff alleges he made numerous requests for interpreters between June and November 2015 and that Wright and Strudthoff looked for other options after learning the cost of interpreting services in June 2015. (Filing 12 at CM/ECF pp. 74, 80.) Plaintiff also alleges, though, that he was provided interpreters beginning in December 2015 at the monthly safety meetings and during each disciplinary meeting up until his termination in August 2016. The approximately nine-month interval between Plaintiff's requests for accommodation and his termination does not create any inference of a causal connection, particularly since the accommodation was provided during that time. Nor can a causal connection be reasonably inferred from Plaintiff's request in late July 2016 for an interpreter to review the handbook with him, which was granted, and his termination approximately one month later. "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel*, 169 F.3d at 1136; *see Kipp v. Missouri Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) ("[T]he interval of two months between the complaint and Ms. Kipp's

15

termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in Ms. Kipp's favor on the matter of causal link."); *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 852 (8th Cir. 2005) (four-week interval between plaintiff's complaint of harassment and her layoff was insufficient to establish showing of causal connection, given that she missed many days of work in the interval and the company was undergoing a period of layoffs). Thus, the court concludes that Plaintiff has failed to state a plausible retaliation claim under the ADA.[4]

## V. CONCLUSION

Plaintiff's Amended Complaint fails to state a claim upon which relief may be granted. The court concludes that further amendment would be futile and, in reaching that conclusion, has reviewed and considered the supplemental materials (filings 15–19, 24, & 26) filed by Plaintiff. Accordingly, the court will dismiss this matter with prejudice.

IT IS THEREFORE ORDERED that:

1. This matter is dismissed with prejudice for failure to state a claim upon which relief may be granted.

2. The court will enter judgment by separate document.

---

[4] For the sake of completeness, the court notes that Plaintiff's allegation that he told another employee, Jorge, that he was thinking of filing an EEOC claim (filing 12 at CM/ECF pp. 54, 71–72), cannot be construed as stating a plausible retaliation claim. While filing an EEOC claim is clearly a protected activity, Plaintiff does not allege that he ever expressed this desire to file a claim to any of his supervisors, nor does he allege any facts suggesting a causal connection between this statement and his termination. *See Lockridge v. HBE Corp*, 543 F. Supp. 2d 1048, 1060 (E.D. Mo. 2008) ("For the causation element to be satisfied, 'decision-makers must have awareness of the protected activity.'") (quoting *Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006)).

Dated this 30th day of September, 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge